**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | | |
|---|---|---|
| KARA LYNN McMURRAY | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Action No.: 8:20-cv-00919-PJM |
| | : | |
| | : | |
| LT. RICHARD TALLANT, *et al.*, | : | |
| | : | |
| Defendants | : | |

**PRETRIAL ORDER**

## I.   BRIEF STATEMENT OF FACTS

### Plaintiff's Brief Statement of Facts

Plaintiff Kara McMurray joined the Prince George's County Police Department in October 2013 and completed her police academy training in June 2014. She started her police career in the Bureau of Patrol as a patrol officer, assigned to District III, Squad 44. She enjoyed a good reputation in the department as an intelligent and hard-working police officer.

In October 2016, Lt. Richard Tallant was transferred to District III and became the supervisor of two patrol squads, including Squad 44. McMurray's interaction with Tallant was limited to seeing him occasionally at roll call, and at major crime scenes. Although she knew who Tallant was, she had no personal interactions with him.

On February 9, 2017, Squad 44 worked the last day in a series of evening shifts. As was the tradition for the squad, it met at the FOP to socialize. McMurray arrived at the FOP around 1:00 a.m. The senior corporal, Allen Smith, was already at the lodge as well as other squad members, Gordon Harris, Walter King, and Jason Swope. Tallant was also present. McMurray did not have any direct interaction with Tallant in the lodge. However, she noticed that Tallant was drinking alcohol. By his own admission, he drank four to five bottles of beer in the lodge.

McMurray drank 2-3 Bud Lite beers.

The FOP Lodge closed at 2 a.m.  The officers in the squad moved to the front parking lot of the building.  Swope, Smith, Harris, King, Tallant, and McMurray gathered near King's Honda Pilot.  Officer Justin Burbank, another squad member, arrived and joined the group. By that time, the group had dwindled to Smith, Tallant, King, and McMurray.  Smith left a few minutes after Burbank got there.

The officers passed around a bottle of Crown Royal Apple.  Ex. 3, 115.  Also, Burbank had brought some homemade moonshine. McMurray tasted it, but she did not like it and she didn't drink it.  She did not drink at all in the parking lot. Tallant continued to drink and had four to five "sips" of Crown Apple.  According to the observation of the other officers and by his own admission, he was intoxicated.

It was a cold night, and the officers remained near the Honda Pilot.  McMurray sat down at the rear tailgate, which was open, resting her legs outside of the car.  The officers continued to talk, joke, and laugh.  Tallant was a part of the group, but McMurray did not have any conversation with him.

McMurray indicated that she was going to leave, as she needed to use the bathroom. Realizing that he was low on gas, King proposed to drive to a gas station where he could refuel, and McMurray could use the bathroom.  King, Burbank, McMurray, and Tallant went in King's car to a nearby gas station.

During the trip, the back passenger seats of King's car were down. McMurray knelt on the back of the seats behind King, bracing one arm against the center console and holding the driver's seat with her other hand.  Tallant also sat in the right rear with his back against the right rear passenger door.  McMurray continued to converse with Burbank and King.  Their mood was jovial.

Tallant was the "odd man out," and was not involved in their conversation.

When they arrived at the gas station, McMurray stayed in the car because it was cold.  King left the car to fuel up.  When he returned to the car, he told McMurray that the bathroom was not open.  They then drove back to the lodge.

On the return trip, the officers remained in the same positions previously.  When they returned to the lodge, McMurray told the other officers that she was going to drive to the Wawa to use the bathroom.  Burbank and King convinced her that she could use the bathroom in the wooded area on lodge property.  McMurray then got out of the car, walked up a hill, and found "a bunch of trees and bushes" far enough away to ensure privacy. Shortly after, Tallant told Burbank that he also had to use the bathroom and got out of the car and went off.

After she relieved herself, McMurray started walking back to the car, following the same path she used.   From "out of nowhere," she was grabbed in a bear-hug around her chest and taken to the ground.  Her attacker fell on top of her, grabbed her hair, and held her head down to the ground.  She rolled onto her back and the attacker shifted his weight onto her right arm.  She saw that the attacker was Tallant.  He began forcibly kissing her on her face and attempted to stick his tongue in her mouth.  She could smell alcohol on his breath.  She screamed, "What are you doing. Stop.  Get off me!"  He refused to stop.  He forcibly thrust his right hand down the front of her pants and forced his hand underneath her underwear and penetrated her vagina with his fingers. In an effort to stop the attack, McMurray said, "stop, I think people are coming!"  Tallant lifted his body, and McMurray felt his weight release off of her right arm. She immediately got up and started to run.  She ran past both King and Burbank.

King and Burbank had exited the car to check on McMurray and Tallant.  Burbank thought that "something seemed off." He retrieved his flashlight from his car and he and King then walked

toward the woods adjacent to the parking lot.

As they entered the wood line, Burbank saw Tallant lying on his left side, blocking Burbank's view of McMurray. He saw McMurray jump up, and she looked "upset." According to Burbank, McMurray "didn't look as one who was caught in a consensual act."

McMurray ran and Burbank went after her. She sprinted down a steep hill and they both fell down. Burbank saw her wiping away tears. She got into her car, where she sat and cried. King escorted Tallant into his car, and Tallant drove away.

McMurray was extremely upset and would not talk to Burbank or King. She was "scared and embarrassed." She drove home, took a shower, and went to bed.

The zipper of McMurray's BDU pants had been torn off during the assault. On February 13, 2017, McMurray went to a police supply store to replace the pants. She asked Burbank to accompany her. She used the opportunity to tell Burbank that Tallant had sexually assaulted her. She expressed her concern about reporting the incident, and Burbank agreed that he would not tell anyone.

A few days after the incident, McMurray returned to work. Tallant "cornered" her in the stairwell of the District III station. He asked her whether he "needed to leave the squad" as a result of the incident. She responded that she "wanted him to leave her alone," and she walked away.

In the days and weeks following, Tallant persisted in referencing the incident in McMurray's presence. She was responsible for doing payroll for the squad, and performed this task at the station. On at least 10 to 15 occasions, Tallant came in and began talking to various members of the squad about the night of the assault. He joked about how "blacked out drunk" he was "that night," and that "he didn't remember anything that happened." The corporal of the squad "thought it was odd that he [Tallant] … kept saying [how] messed up [he was]." He also noticed

Tallant "lingering in the office … trying to talk to her [McMurray] and stuff like that." Tallant's behavior at the office affected McMurray, and she decided to stop doing payroll. Her corporal was "shocked," since McMurray "liked" doing payroll. After criminal charges against Tallant came, the corporal saw that Tallant's peculiar statements and behavior about "that night" were linked to his culpable conduct.

McMurray believed that if she reported the assault, it would be covered up and damage her career. She knew that Tallant had many friends and connections in the police department who controlled access to most of the desirable positions.

A few months after the assault, McMurray told her sergeant, Sgt. Richard Jackson, about the assault. He told her that if she reported Tallant, the matter would not be taken seriously and would be covered up. In 2019, Sgt. Jackson commented to a fellow officer that Tallant had raped McMurray. That officer reported the conversation to the Internal Affairs Division, which prompted an investigation, and she was immediately ordered to report to Internal Affairs for an interview. Without forewarning, she was demanded to answer questions about the events of February 10, 2017. Reluctantly, she truthfully answered all questions. Burbank and King were also interviewed the same day.

The Internal Affairs investigation, at the outset, demonstrated that McMurray's concerns about reporting Tallant's misconduct were justified. The IAD investigation was initially conducted by Lieutenant Robert Black, an experienced investigator assigned to the Special Investigative Response Team (SIRT) of the Internal Affairs Division. With Black as the lead investigator, both King and Burbank were interviewed, and they corroborated McMurray's account. However, within two weeks, the investigation was re-assigned to Sergeant Ricardo Jacob. Jacob was not neutral and unbiased, since he had worked with Tallant for several years.

Although Jacob never spoke with McMurray about the facts of the case in any depth, he quickly formed an opinion that she was not being truthful. He was responsible for screening the case for prosecution with the State's Attorney's Office. When he met with Assistant State's Attorney Rene Joy, he "downplayed [the case] to her and it was misrepresented." Joy revamped the investigation. Jacob was removed and responsibility for the investigation was returned to Lieutenant Black. When criminal charges were eventually made against Tallant, Jacob cooperated with Tallant's defense attorneys, who called him as a character witness on behalf of Tallant.

An even more troublesome circumstance was that the IAD investigation was immediately leaked. The day after McMurray made her statement to IAD, Corporal Smith told McMurray that "Tallant's friends and associates had talked to him about the investigation," and that he "knew everything about her complaint against Tallant." Officers spread rumors about McMurray, attacking her credibility and disparaging her. Burbank testified that he heard false rumors about the case from police dispatchers, officers, detectives, and retired members of the Sheriff's Department. McMurray's allegations were spread wide through the department. She became the butt of ridicule and insult from officers. The rumors were that McMurray was "sleeping around and that it was a normal thing for her and Tallant to hook up"; that she was a "slut" and "easy"; and that "she hooked up with hundreds of officers."

Although most officers did not approach McMurray directly, some were openly hostile and threatening. On May 15, 2019, Officer Jason Swope confronted McMurray at a police event on the National Mall. He told her, "you're the reason Lieutenant Tallant is going through all this shit right now." His demeanor was "extremely hostile," according to a police officer who witnessed the confrontation. In another case, while waiting for court appearances, an officer within her earshot of McMurray and other officers said about her "that pussy must have been good." Cpl.

Smith heard officers falsely say that McMurray was a "home wrecker" and "a liar," and that she had "a relationship with Tallant for years."

In September 2019, Tallant was indicted for the felony of second-degree sexual offense. In the lead-up to the trial, there was an increase in the lack of support for McMurray within the Department. She "maintained a downward spiral the whole length of the process – she was scared and concerned." She became more fearful that she lacked the support of other officers and that she might not be backed up on the street. Cpl. Smith, a seasoned veteran, maintained that her fears were reasonable. This became more evident later.

On October 20, 2020, Corporal Darryl Wormuth physically abused a juvenile during an arrest. The incident was witnessed by two members of Squad 44 – McMurray's old squad – who reported Wormuth's misconduct. An IAD investigation was initiated. Wormuth was indicted for assault and misconduct and eventually found guilty of such charges. In the course of that investigation, text messages involving Lt. Edward Scott Finn and other influential supervisors were obtained. The gist of these messages demonstrated a consensus that officers who report misconduct by other officers should not be backed up on the street. The officers participating in the text took particular notice that the squad of the officer who reported Wormuth was on the same squad of the officer (McMurray) who had reported Tallant's assault.

Although McMurray had legitimate concerns about being backed up in the months leading up to Tallant's criminal trial, she felt supported by her squad sergeant, Jennifer Ivey. The command staff knew that Sergeant Ivey supported McMurray, but the District III commander, Major Shawne Waddy, decided to transfer Sgt. Ivey anyway.

When McMurray learned that her sergeant was being transferred, she became fearful about her ability to cope without her sergeant's support. Her sergeant called Sergeant Renee Plum, who

worked in the Psychological Services Division of the Department. Plum called McMurray and suggested that she transfer out of the patrol division. Plum stated that "we can try and get you off the street." Plum asked McMurray where she would like to be reassigned. McMurray gave her two choices: Homeland Security and the K-9 unit. Plum also suggested the Marine Unit, and McMurray agreed that would be acceptable as well.

During her conversations with McMurray, Plum also suggested that she consider transferring to the Evidence Unit. McMurray told her that she was not interested in working there. It was a field that she did not regard as traditional police work.

Plum followed up with McMurray and informed her that her choices for reassignment were not available because Tallant had friends in those units. Plum told McMurray that she would have to select another option. McMurray suggested another unit. Plum said that she would take that pick to the Chief. McMurray did not hear back about her request for transfer before the criminal trial began.

The criminal trial against Tallant began on December 10, 2019. It was a spectacle of total support for Tallant by the police department. Most of the members of the units in which Tallant worked lined up in the courtroom in a show of support. Tallant's side of the courtroom was completely packed. They included lieutenants, captains, and majors. Support in the courtroom was little to none. It was an intimidating atmosphere. As the victim and complainant, McMurray felt acutely the threat to her career created by the atmosphere in the courtroom. It contributed to McMurray's belief that her career as a Prince George's County Police officer would be stymied as a result of her complaint against Tallant.

During the criminal trial, the prosecutors recognized the pressure McMurray was experiencing from other officers, and they were aware of her concern for her personal safety while

working in a patrol position.  Assistant State's Attorney Rene Joy contacted Captain Robinson and specifically told him that she was concerned that McMurray would not be backed up by other officers.  Captain Robinson passed this concern up the chain of command. He spoke directly with McMurray, who indicated that she wanted to transfer out of patrol "because of the gravity of the situation."  McMurray and Robinson discussed options for McMurray's reassignment.  Robinson could not recall specifically which units she requested, but he was sure she did not request the Evidence Unit.  Nevertheless, a decision was made further up the chain of command to move McMurray to the Evidence Unit.

Jury deliberations in the Tallant case began on December 17, 2019.  On that day, Captain Robinson advised McMurray that she was being transferred to the Evidence Unit.  Although she had no interest in working in that unit, McMurray reported to the Evidence Unit as ordered.

On December 18, 2019, the jury returned a verdict against Tallant, finding him guilty of sexual offense in the second degree.  Although Tallant was convicted and sentenced, McMurray continued to experience hostility from members of the police department. Rumors and derogatory comments about her continued to circulate throughout the police department.  Detectives refused to speak to her at crime scenes to which she was dispatched as an evidence technician.  Supervisors continued to advocate within the police department on behalf of Tallant.

Lieutenant Patrick Hampson had been employed with the Prince George's County police department for over 22 years.  He has worked in most of the high-profile specialty units of the police department, including SAT, NED, RST, and Homicide.  He worked with Tallan.  He was present in the courtroom when Tallant was found guilty. Hampson commenced efforts to contact Internal Affairs in an effort to reopen the investigation to focus on McMurray's "credibility." He also sought to interview members of squad 44 who had worked with McMurray.   He spread false

rumors that McMurray had been involved in sexual relationships with both Officers King and Burbank, and he discussed these groundless allegations with other supervisors.  His goal was to discredit McMurray. Ultimately, the Department brought charges against Hampson for these unauthorized activities and abuse of his position and he retired in disgrace.

McMurray's testimony led to Tallant's conviction.  He was ultimately sentenced to prison to serve a seven-year sentence.  She decided that she would never be able to return to regular police work with the department.  She continued to work in the Evidence Unit for approximately two years because she needed the income that the job provided.  However, she knew realistically that she could never recover from the stigma of testifying against a fellow officer.  The fact that she was the victim of a sexual assault was meaningless in a police department that failed to protect and support her.  Even in the Evidence Unit, she was ostracized as a "snitch."  McMurray tendered her resignation on November 4, 2021.

**Defendant Prince George's County's Brief Statement of the Facts**

In the early morning hours of February 10, 2017, Ms. McMurray, then a POFC in the Prince George's County Police Department, alleges that she was sexually assaulted by Lieutenant Richard Tallant in the woods behind the local Fraternal Order of Police Lodge ("FOP Lodge") after a night of heavy drinking and socializing with members of their squad. At the time, the County had a clearly established sexual harassment policy, which provided several avenues for reporting misconduct. Ms. McMurray was well aware of the policy as she had been trained on it at the academy and had been sent updates to the applicable General Order throughout her tenure with the County. Although Ms. McMurray was well aware of the policy, she made a conscious decision not to report the alleged conduct to anyone. Indeed, Ms. McMurray chose not to disclose this

alleged conduct to anyone in her chain of command, the Assistant Equal Opportunity Coordinator, or the Equal Opportunity Coordinator.

In March or April of 2017, Ms. McMurray began dating someone in her direct chain of command, Sergeant Richard Jackson. Later in the Spring of 2017, Ms. McMurray, without going into detail, informed Sgt. Jackson that Lt. Tallant had sexually assaulted her. Ms. McMurray asked Sgt. Jackson not to report the incident.

Ms. McMurray's romantic relationship with Sgt. Jackson began to deteriorate in November 2018. After the relationship ended, Sgt. Jackson acted erratically by disturbing Ms. McMurray at her residence and showing up on calls that Ms. McMurray was working. Ms. McMurray reported these issues to her chain of command, leading to an investigation by the Department's Internal Affairs Division ("IAD"). This report confirms that Ms. McMurray was fully apprised of the County's sexual harassment policy and complaint procedure.

On April 26, 2019, while attending an Orioles baseball game, Sgt. Jackson informed fellow police officer Sgt. Daniel Hader that Lt. Tallant had allegedly sexually assaulted Ms. McMurray on February 9, 2017. The next day, Sgt. Hader reported the alleged sexual assault to IAD. This report came more than two (2) years after the alleged conduct took place.

After receiving Sgt. Hader's report, IAD immediately acted. That same day, Lt. Robert Black coordinated with IAD Detective Je'Net Pettus to arrange an interview with Ms. McMurray. Following the interview, a full investigation was opened by IAD and Lt. Tallant was placed on administrative leave. The investigation was originally assigned to Sgt. Ricardo Jacob. However, shortly after he was assigned the case, Sgt. Jacob was reassigned to the Intelligence Surveillance Unit. Lt. Black assumed control of the matter and oversaw an extremely thorough investigation, which included thousands of pages of documents and dozens of interviews. The evidence that IAD

collected was ultimately turned over to the Prince George's County State's Attorney's Office ("SAO"). Based on the evidence collected by IAD, the SAO was able to secure an indictment against Lt. Tallant.

On December 10, 2019, Lieutenant Tallant's trial for second-degree sex offense commenced. The trial was fraught with conflicts of interest, prosecutorial misconduct, and improper evidentiary rulings. On December 17, 2019, Lieutenant Tallant was convicted and immediately taken into custody. He was ultimately sentenced to a ten (10) year term of incarceration. Notably absent from Plaintiff's statement of facts is what transpired after sentencing. Subsequent to his conviction, Lieutenant Tallant filed a Motion for a New Trial and a Supplemental Motion for a New Trial. Following extensive oral argument, the Circuit Court for Prince George's County rendered an oral ruling on March 23, 2023. It found that the State committed extensive discovery violations and that there is a reasonable probability that had the suppressed evidence been disclosed, the result of the trial would have been different. Accordingly, the Court issued an order vacating Lieutenant Tallant's conviction.

Around the time of the trial, Ms. McMurray was connected with Sgt. Renee Plum of the Psychological Services Unit. She expressed to Sgt. Plum that, because of the notoriety of Lt. Tallant's criminal case, she was concerned that she may be recognized by members of the public while on patrol. Sgt. Plum offered to assist Ms. McMurray in requesting a temporary reassignment to a unit with less public visibility. Ms. McMurray requested reassignment to the Narcotics Enforcement Unit, the K-9 Unit, or the Aviation Unit. Although reassignments are not guaranteed, Sgt. Plum brought these requested units to Deputy Chief Anthony Schartner. It was determined that the Narcotics Enforcement Unit was not a good fit for Ms. McMurray as that was the unit that Lt. Tallant had the most ties to. The K-9 Unit and Aviation Unit were also not feasible given Ms.

McMurray's immediate timeline. These units both require that applicants pass physical and written tests and successfully interview before being admitted. This process, plainly, can take a significant amount of time. Sgt. Plum subsequently asked Ms. McMurray if there were any other specialty units that she was interested in. Ms. McMurray indicated that she was interested in the Evidence Unit, which is within the Crime Scene Investigations Division. Deputy Chief Schartner determined that Ms. McMurray was eligible for assignment to the Evidence Unit and the then Police Chief, Henry Stawinski, approved Ms. McMurray's immediate reassignment to that unit.

Ms. McMurray began in the Evidence Unit in December 2019. Similar to many other units, Evidence Unit employees do shift work and are eligible for overtime pay. Evidence Unit employees also receive "on-call" pay. Ms. McMurray did very well in the Evidence Unit, earning a rating of "very good" on her performance appraisal. She maintained this level of performance until early May 2021 when she went out on maternity leave. While out on leave, Ms. McMurray did not demonstrate an eagerness to return to her position with the County as she twice requested lengthy—months long—extensions of her maternity leave. She was ultimately granted two additional weeks of leave and returned to work on October 13, 2021.

Shortly after returning to work, Ms. McMurray alleges that she learned that Evidence Unit Lieutenant David Vastag had made disparaging comments about her during a "roll call." Ms. McMurray learned this information through her then boyfriend, Thomas Rickard, who was an Officer in the Charles County Sheriff's Office. Mr. Rickard received this information through Richard Kerlin, who is a colleague and close friend of his. Mr. Kerlin alleges that he learned this information through a woman he was dating that worked in the Evidence Unit. This woman, Kellie Sullivan, has categorically denied that she ever stated that Lt. Vastag made disparaging remarks about Ms. McMurray. Furthermore, several members of the Evidence Unit have testified that the

unit does not even have "roll calls" and that they never heard Lt. Vastag make disparaging comments about Ms. McMurray.

On November 2, 2021, Ms. McMurray voluntarily resigned from the Prince George's County Police Department.

**Defendant Lt. Richard Tallant's Brief Statement of the Facts**

Lt. Richard Tallant was a decorated, well respected, and well-liked officer within the Prince George's County Police Department.  In late 2016, after service in the VICE Unit and SWAT, he was assigned as the shift commander in patrol, overseeing squads that included that of the Plaintiff, Kara McMurray.  Prior to February 9, 2017, Defendant Lt. Richard Tallant's interactions with Plaintiff, Cpl. Kara McMurray were limited. Lt. Tallant had never interacted with Cpl. McMurray on a personal or social basis. Cpl. McMurray and Lt. Tallant's interactions as officers of the Prince George's County Police Department were extremely limited, but purely professional. The two had some interactions were Lt. Tallant's occasional presence at rollcall or talks to the squads and on a couple of occasions regarding of Cpl. McMurray's professional aspirations, including going to VICE or the Homeland Security Unit, and an incident in which she was injured during SWAT training. The parties had never seen one another outside of work, nor had the two ever corresponded via telephone or email. There was "really no relationship or interaction" between Cpl. McMurray and Lt. Tallant, and the limited interactions were Lt. Tallant's occasional presence at rollcall or talks to the squads.

February 9, 2017, was the last day of Cpl. McMurray's squad's work week and was to be followed by four (4) days off. Traditionally, on such occasions members of Cpl. McMurray's squad would meet at the Fraternal Order of Police Prince George's County Lodge 89 ("FOP

Lodge" or "Lodge") for the purpose of relaxing and unwinding. On February 9, 2017, members of the squad persuaded Lt. Tallant to join them at the lodge for the end of week meet up.

When the shift ended at 1:30 a.m. that following morning, Lt. Tallant, Cpl. McMurray, along with members of her squad went to the FOP Lodge for the purpose of hanging out, and consuming alcoholic beverages. Prior to going to the Lodge, Cpl. McMurray left her police cruiser at the Equestrian Center and picked up her personal vehicle. Given that she was off duty and the uniform is not particularly comfortable, Cpl. McMurray also removed her uniform shirt, vest, and gun belt.

When Cpl. McMurray arrived at the Lodge, other members of the squad, having also just gotten off work, were showing up around the same time. Because they were consuming alcohol, no one at the Lodge was in full uniform. The Lodge bar has a policy against serving an officer if he or she is wearing their gun belt. Initially when she got to the Lodge bar, Cpl. McMurray was hanging out with Cpl. Alan Smith, Cpl. Gordon Harris, and Ofc. Walter King. Lt. Tallant also arrived at the Lodge, but Cpl. McMurray did not have any conversations with him inside the Lodge. That night served as the first time Cpl. McMurray saw Lt. Tallant at the FOP Lodge. While Cpl. McMurray never witnessed Lt. Tallant consuming alcohol, she assumed he was because all of the members of the squad were drinking. Cpl. McMurray, along with the other officers at the lodge were all drinking, mostly beer.

After the Lodge closed at some time after 2:00 a.m., the group went outside to the parking lot to continue talking, laughing, and having conversations. Although most of the officers there left, Lt. Tallant, Sgt. Jason Swope, Cpl. McMurray, Cpl. Smith, and Ofc. King remained in the lot. Around this time, Ofc. Justin Burbank also arrived. Ofc. Burbank brought out a makeshift moonshine style drink that he called moonshine, that was a mixture of drinks he combined, and

shared it with the group.  The entire group of remaining officers shared the drink. Cpl. McMurray tried the drink and with it, along with the beers, felt buzzed.

The remaining officers continued to sit around, talk, laugh, and have a good time. During that conversation, Lt. Tallant never said anything personally to Cpl. McMurray, made any inappropriate comments, attempted to touch her, or otherwise made her feel uncomfortable. Throughout this encounter, Cpl. McMurray was laughing and talking about the squad.  At some point, Lt. Tallant and Cpl. McMurray both sat and/or laid on the back of a tailgate next to one another and at times Cpl. McMurray would roll over to a point where she was touching Lt. Tallant. Among the remaining officers, Sgt. Swope and Cpl. Smith then left. After Sgt. Swope and Cpl. Smith left, Cpl. McMurray advised that she was getting cold and needed to use the bathroom. After telling Ofc. Burbank and Ofc. King her intention to go to the Wawa convenience store and come back, Cpl. McMurray was convinced to accompany the group to a gas station instead, as Ofc. King needed to fill up.

Ofc. King, Ofc. Burbank, Lt. Tallant and Cpl. McMurray then got into Ofc. King's personal vehicle, with Ofc. King driving, Ofc. Burbank in the front passenger seat, and Lt. Tallant and Cpl. McMurray in the back passenger compartment. During the ride, the group continued talking and laughing. During the drive, Lt. Tallant did not touch Cpl. McMurray, look at her in any weird way, or otherwise make her feel uncomfortable. When they arrived at the gas station, Ofc. King pumped his gas, but found that the bathroom was unavailable. Once Ofc. King finished getting his gas, the group drove back to the FOP Lodge parking lot. During the drive back, the group continued talking and laughing. During the return ride, Lt. Tallant did not touch Cpl. McMurray, look at her in any weird way, or otherwise make her feel uncomfortable.

Once the group returned to the Lodge parking lot at approximately 4:00 a.m., Ofc. King and Ofc. Burbank told Cpl. McMurray that she could relieve herself in the woods, at which point she got out of the car, and walked up the hill to relieve herself. After relieving herself, Cpl. McMurray began to walk back to the car.  Lt. Tallant, also having to relieve himself, walked back into the near pitch black of the hill. As he did so, he saw Cpl. McMurray and asked her "Where are you going?" At that point, Cpl. McMurray put her arms up with Lt. Tallant's arms and made contact with him. They both looked over to see how close the cars in the parking lot were to them. Cpl. McMurray when laid Lt. Tallant down.

As they laid on the ground, with Cpl. McMurray on her right side and Lt. Tallant on his left side parallel to one another, Cpl. McMurray began to rub on Lt. Tallant and kiss at his neck. Just as tat what happening Ofc. Burbank approached with his flashlight.  Cpl. McMurray then said, "somebody's coming" and popped up from the ground saying "Oh shit, oh shit." Cpl. McMurray then ran past Ofc. King and Ofc. Burbank, who were in fact approaching, back to her car. Once in her car, Cpl. McMurray shut her door and began to cry. Cpl. McMurray did not tell anyone that night what had happened. Lt. Tallant then got into his car and left, followed by Ofc. Burbank. *Id*. Ofc. King and Cpl. McMurray then left shortly thereafter. *Id*. Lt. Tallant called Ofc. Burbrink later that night to inquire as to whether he left his cell phone in Ofc. Burbrink's vehicle.

Following that night, while Cpl. McMurray would occasionally see Lt. Tallant at rollcall or on a scene, those interactions were always professional. Cpl. McMurray claims to have heard Lt. Tallant telling co-workers "[y]'all got me really drunk that night. I've never been that drunk. You all got me blacked out drunk," on multiple occasions. Subsequent to the February 10, 2017, off-duty incident, Cpl. McMurray never experienced any form of harassment from Lt. Tallant.

Following the February 10, 2017, off-duty interaction with Lt. Tallant, Cpl. McMurray never planned on reporting the incident to anyone. Cpl. McMurray kept the incident to herself and did not tell family or friends. While Cpl. McMurray does not recall exactly what she told Ofc. Burbank after the incident, she told Ofc. Burbank not to tell anyone. Cpl. McMurray never told Ofc. King what happened. Cpl. McMurray also did not want Ofc. King to tell anyone about what happened.  In March or April of 2017, Cpl. McMurray began dating Sgt. Richard Jackson, also of the Prince George's County Police Department. Cpl. McMurray confided in Sgt. Jackson as her boyfriend, telling him her version of what happened, but not in detail. The first time Cpl. McMurray told Sgt. Jackson about the interaction with Lt. Tallant in late spring of 2017, she alleged that she was assaulted without going into detail.

When the topic came up again in the summer of 2017, Cpl. McMurray alleged to Sgt. Jackson that she was sexually assaulted. Neither conversation took place at work. Cpl. McMurray told Sgt. Jackson that she did not want anyone else to know about the incident with Lt. Tallant. Cpl. McMurray told Sgt. Jackson, Ofc. Burbank, and Ofc. King not to say anything about the incident. Cpl. McMurray never advised her corporal, captain, or major of the interaction with Lt. Tallant. Cpl. McMurray also chose not to self-report the incident to Internal Affairs. Cpl. McMurray also did not file an Equal Employment Opportunity Commission complaint. Prior to being approached, Cpl. McMurray did not advise anyone from the State's Attorney's Office of what took place. Cpl. McMurray also never advised anyone of the County Attorney's Office of the incident with Lt. Tallant.

Cpl. McMurray ended her relationship with Sgt. Jackson at the end of 2018, after which time Sgt. Jackson began to act erratically, culminating in Cpl. McMurray filing an internal affairs complaint against him. At some point during the internal investigation into him in 2019, Sgt.

Jackson broke Cpl. McMurray's confidence and came forward about the off-duty February 10, 2017, Lt. Tallant incident. In April of 2019, Cpl. McMurray was called to Internal Affairs to give a statement and provided her first account of the February 10, 2017, off-duty incident to the Internal Affairs Division investigator. Lt. Tallant was suspended within days of Cpl. McMurray's statement.  Following Cpl. McMurray's statement in April of 2019, the investigation into Lt. Tallant's actions was referred to the State's Attorney for Prince George's County.  Cpl. McMurray then spoke with an attorney with the State's Attorney's Office about the incident. In December of 2019, Lt. Tallant was convicted based upon Cpl. McMurray's account of the February 10, 2017, interaction.

On March 6, 2023, that conviction was vacated pursuant to a supplemental motion for new trial on the basis of prosecutorial misconduct.  On April 7, 2023, pursuant to an Appellate Court of Maryland ruling in *Lee v. State*, 257 Md. App. 481 (2023), the order vacating the conviction was vacated for a failure to provide Ms. McMurry the ability to be present. The order which vacated the order vacating the conviction is currently on appeal. As such, that appeal and a potential hearing on the new trial which was previously granted are pending.

Between the February 10, 2017, off-duty incident date and giving her statement over two years later in April of 2019, Cpl. McMurray never advised Internal Affairs, the State's Attorney's Office, or the County Attorney's Office of the incident. From the February 10, 2017, off-duty incident date to the date of filing suit, Cpl. McMurray never notified the County Attorney's Officer or Lt. Tallant of intention to sue. Lt. Tallant never gave Plaintiff McMurray any negative performance reviews, played any part on her transfer or promotion, or directed anyone, directly or indirectly to harass Cpl. McMurray.

## II.   LEGAL THEORIES AND DEFENSES

**Legal Theories of Plaintiff's Claims**

The legal theories of the claims made in this case are as follows:

1.      An employer's supervisor who sexually assaults an employee, and is aided in doing so by his authority over the employee, discriminates against the employee on the basis of sex and violates Title VII, § 703, 42 U.SC. § 2000e-2.  The term "employer" specifically includes "agents" of the employer. 42 U.S.C. § 2000e(b). Title VII imposes liability on the employer for sexual harassment committed by a supervisor who "was aided in accomplishing the tort by the existence of the agency relation. *Burlington Industries v. Ellerth*, 524 U.S. 742, 754 (1998). The harassment culminated in a tangible employment action, i.e., a reassignment with significantly different responsibilities and ultimately a constructive discharge.  This is the legal theory that supports Count V of the Third Amended Complaint.

2.      § 704 of Title VII, 42 U.S.C. §2002e-3, forbids discrimination against an employee for opposing any practice made an unlawful employment practice by Title VII or because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing concerning alleged discrimination under that Title. This is the foundation for the retaliation claim alleged in Count VI. As a result of McMurray's complaint against Tallant, participation in an investigation of her complaint and testifying against him, she was exposed to ridicule, insult and attacks on her character.  She had a reasonable fear that she would not be backed-up on patrol and was subjected to a transfer to the Evidence Unit which is not traditional police work and was not desirable for her.  She intended to leave but delayed until she could find suitable employment. She experienced further harassment in the Evidence Unit where a supervisor called her a "snitch" and someone not to associate with.  She knew that she faced the prospect of continued hostility and lack of support by other officers, so she discontinued her employment. This is a form of

constructive discharge.

3.      Tallant's sexual assault upon McMurray was a form of gender discrimination that violated the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution.   This is the basis for the claim under 42 U.S.C. §1983 alleged in Count I and the assault claim under Count III.   In committing the act, Tallant acted under color of law by abusing the power or position which the State conferred upon him.   *Bonenberger v. Plymouth Township*, 132 F.3d 20, 24-25 (3rd Cir. 1997)("If a state entity places an official in the position of supervising a lesser-ranking employee and empowers him or her to give orders which the subordinate may not disobey without fear or formal reprisal, that official wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983).)

4.      The legal theory for Count II is a *Monell* claim against Prince George's County that alleges a practice or custom of failure to train, supervise and discipline officers, including promoting and fostering intimidation and outright refusal to backup officers who make complaints of misconduct by other officers on the Department, and allowing officers who commit criminal acts to take full retirement and escape accountability for their misconduct.

**Legal Theories and Defenses of Defendant Prince George's County**

1.      The County cannot be held strictly liable for a supervisor's sexual harassment of an employee if no tangible employment action was taken against the employee. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 724, 765 (1998). In order to raise this affirmative defense, an employer must establish: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524

U.S. at 807, *Ellerth*, 524 U.S. at 765.

2.      Title VII of makes it "unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff has not adduced any evidence suggesting that she was discriminated at all, let alone because of her sex. No jury could conclude that Plaintiff was, because of her sex, subjected to a work environment that was "sufficiently severe or pervasive to create an abusive working environment." *Ocheltree v. Scollon Produc., Inc.*, 335 F.3d 325, 338 (4th Cir. 2003).

3.      Plaintiff was not subjected to retaliation under Title VII. To succeed on this claim, Plaintiff must prove (1) that she engaged in a protected activity, (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events. *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (citation omitted). The evidence will show that as soon as the County was made aware of Plaintiff's allegations, it took immediate corrective action. It conducted a thorough investigation which resulted in the successful indictment of Lieutenant Tallant. The evidence will also show that the County never took an adverse employment action against Plaintiff. Any alleged employment actions were made at Plaintiff's request and for her benefit.

4.      The constitutional claim brought against Lieutenant Tallant must fail as he was not acting under color of law when the alleged assault took place. "An officer can be on-duty, in uniform, in the station house itself and still not be acting under the color of state law." *Bailey v. Prince George's Cnty.*, 34 F.Supp.2d 1025, 1026-28 (D. Md. 1999). The color of law requirement excludes from the reach of § 1983 all "merely private conduct, no matter how discriminatory or

wrongful." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

5.       42 U.S.C. § 1983 is not the proper vehicle for a claim against the County. "Both the Fourth Circuit and this Court have held that the fact that a plaintiff originally could have instituted a Title VII cause of action precluded a suit brought under § 1983 for violation of the Fourteenth Amendment." *Temple v. Benjamin*, No. Civ. H-01-720, 2001 WL 826576 (D. Md. July 19, 2001) (citing *Zombro v. Balt. City Police Dept.*, 888 F.2d 1364, 1366–67 (4th Cir. 1998), cert. denied, 492 U.S. 850 (1989); *Burtnick v. McClain*, 953 F.Supp. 121-123 (D. Md. 1997)). See also *Great Am. Savings & Loan v. Novotny*, 442 U.S. 366, 372, 375-78 (1979).

6.       Plaintiff cannot establish a Monell claim against the County. To prevail under this theory of liability, Plaintiff must prove that the County failed to "put a stop or correct a widespread pattern of unconstitutional conduct." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). Throughout discovery, Plaintiff failed to adduce a scintilla of evidence showing that the County had a practice and custom, with deliberate indifference, of failing to train, supervise and discipline officers, including Lt. Tallant, with respect to gender and employment discrimination.

7.       To the extent that Plaintiff intends/the Court allows evidence that the County had a practice or custom of "fostering intimidation and outright refusal to backup officers who make complaints of misconduct by other officers on the department," that claim must also fail. To succeed on a Monell claim, the plaintiff must prove "an affirmative causal link between the 'policy or custom,' and the particular injury suffered by the plaintiff." *Washington v. Balt. Police Dep't*, 457 F.Supp.3d 520, 532 (D. Md. 2020) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987)). There is facially no causal link between the alleged assault committed by Lieutenant Tallant and a custom of refusing to back up officers who make complaints of misconduct.

**Legal Theories and Defenses of Defendant Lt. Richard Tallant**

1.      Defendant Lt. Tallant incorporates arguments of Prince George's County

2.      Plaintiff failed to comply with Maryland's Local Government Tort Claims Act's notice requirement or show good cause for failure to comply.

3.      To allege a violation of the Equal Protection Clause based on gender discrimination, the plaintiff must first make a two-part showing: (1) she was treated differently from similarly situated individuals; and (2) the differential treatment was due to "intentional or purposeful discrimination." See *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Plaintiff cannot establish that she was treated differently than similarly situated individuals or subject to purposeful discrimination.

4.      Plaintiff cannot establish that Lt. Tallant, at the point of his alleged tortious conduct, was acting under color of law.

## III.    AMENDMENTS TO PLEADINGS

Plaintiff intends to file a motion for leave to amend Count II to conform to the evidence to support a custom or practice claim against the County.

## IV.    ANY ISSUE TO BE ABANDONED.

None.

## V.    STIPULATIONS OF FACTS OR REQUESTED STIPULATIONS

### Plaintiff's Requested Stipulations

Plaintiff requests a stipulation that she timely filed her complaint of employment with the Equal Employment Opportunity Commission and that she received a notice permitting her to file a lawsuit under Title VII.

Plaintiff also requests a stipulation as to the authenticity to the plaintiff's exhibits.

### Defendant Prince George's County's Requested Stipulations

1.       The County requests that Plaintiff stipulate to the authenticity of all of its exhibits.

2.       The County also requests that Plaintiff stipulate that Lieutenant Tallant's criminal conviction was vacated.

**Defendant Lt. Richard Tallant's Requested Stipulations**

1.       Lt. Tallant requests that Plaintiff stipulate to the authenticity of all of its exhibits.

2.       The County also requests that Plaintiff stipulate that Lieutenant Tallant's criminal conviction was vacated based upon a finding of prosecutorial misconduct, that Motion for New Trial hearing was re-set to conform with Maryland's law on victims' rights, and that the resetting of hearing is pending appeal.

## VI.    DAMAGES

**Economic Damages**

Back pay and front pay under § 706(g)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (g)(1) totals $3,377,591.  An award of back pay and/or front pay under § 706(g)(1) is an equitable form of relief, and it is for the court, not a jury, to decide "whether front pay should be awarded and if so in what amount."  *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991 is an issue for the court).  *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)(an award of front pay or back pay is not a form of "compensatory damages" under § 1981a); *EEOC v. Consolidated Energy, Inc.*, 860 F.3d 131, 140 (4th Cir. 2017)(district court distinguished "compensatory damages," which may be awarded under § 1981(a)(1), from "lost wages," which be awarded as back pay or front pay under § 706).

Lost Overtime Compensation

        $42,744

Lost Income from Secondary Employment

        $255,375

**Non-Economic Damages**

Plaintiff seeks non-pecuniary damages for emotional pain, suffering, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

### EXHIBITS

**Plaintiff's Exhibits**

A list of Plaintiff's exhibits is attached.

**Defendants Prince George's County's Exhibits**

A list of Defendant Prince George's County's exhibits are attached.

**Defendant Lt. Richard Tallant's Exhibits**

A list of Defendant Lt. Richard Tallant's exhibits are attached.

**VII.   WITNESSES**

**Plaintiff's Witnesses**

Detective Robert Douglas Shires
710 Seaborne Ct
Pasadena, Maryland 21122
(631) 456-1286

Cpl. Alan Rodney Smith, #1786
7405 Prospect Hill Ct
Glenn Dale, Maryland
(240) 508-7856

Phoenix Nicholas Langdon
Port Orange, Florida
(By Deposition)

Captain David Robinson, #2563
PGPD, Commander, SIRT
8801 Police Plaza
Upper Marlboro, Maryland 20785
(301) 576-5986
(301) 516-5200

Justin Eric Burbank
2517 Vivaldi Lane

Gambrills, Maryland 21054
(908) 858-0068

Officer Walter King
PGPD

Richard Kerlin
Charles County Sheriff's Office
6915 Crain Highway
La Plata, Maryland 20646
(301) -932-2222

Edward Scott Finn
United States Penitentiary
Lewisburg, Pennsylvania
Represented by Andrew White (443 604 4496)

Assistant State's Attorney John Grochowski
50 Maryland Avenue
5th Floor, North Tower
Rockville, Maryland  20850

Cpl. Jonathan Girard
PGPD, Patrol Division, District VIII – Westphalia
8801 Police Plaza
Upper Marlboro, Maryland 20785
(301) 516-5200

Sgt. Renee Plum, #2150 PGPD, Psych Services Division
8801 Police Plaza
Upper Marlboro, Maryland 20785
(301) 516-5200

Patrick Hampson
Retired from PGPD
Represented by William Brennan

Renee Joy
Maryland Attorney General, Independent Investigations Unit
200 St. Paul Place
Baltimore, Maryland 21202
 (410) 576-7070

Sgt. Ricardo Jacob
PGPD

Anthony Schartner
9423 Seven Locks Road
Bethesda, Maryland

Kelli Sullivan
11949 Galaxy Lane
Bowie, Maryland 20715

Captain Cynthia Ruff
PGPD, Crime Scene Investigative Division
8801 Police Plaza
Upper Marlboro, Maryland 20785
 (301) 516-5200

Lt. David Vastag
Evidence Unit
PGPD
8801 Police Plaza
Upper Marlboro, Maryland 20785

Richard Hinds
Evidence Unit
PGPD
8801 Police Plaza
Upper Marlboro, Maryland 20785

Henry Peter Stawinski
6510 40th Avenue
Hyattsville, Maryland 20782

Major Shawne Waddy
PGPD
7600 Barlowe Road
Landover, Maryland 20785

Officer Michael Brown
PGPD

**Defendant Prince George's County's Witnesses**

Ritchlyn Dantzler
Assistant Manager, Human Resources Department
1400 McCormick Drive
Suite 159
Largo, Maryland

Robert Black

Former Captain, Internal Affairs Unit
Address available upon request
540-663-0307

Steven Frey
8801 Police Plaza
Upper Marlboro, Maryland 20785
Corporal, Patrol Division
240-962-1246

Daniel Hader
8801 Police Plaza
Upper Marlboro, Maryland 20785
Investigator, Internal Affairs Division
240-695-3781

Richard Hinds
Civilian Employee, Evidence Unit
8801 Police Plaza
Upper Marlboro, Maryland 20785
240-832-3016

Jennifer Ivey
Former Sergeant, Patrol Division
Address available upon request
240-882-8641

Ricardo Jacob
Sergeant, Internal Affairs Division
8801 Police Plaza
Upper Marlboro, Maryland 20785

Bryan Medina
Corporal, Internal Affairs Unit
8801 Police Plaza
Upper Marlboro, Maryland 20785
Investigator, Internal Affairs Division

Kathleen Mills
Former Commander, Internal Affairs Division
Address available upon request
240-695-4477

James McCreary
8801 Police Plaza
Upper Marlboro, Maryland 20785

Commander, Internal Affairs Division
301-772-4750

Ja'Net Pettus
8801 Police Plaza
Upper Marlboro, Maryland 20785
Corporal, Internal Affairs Division
240-691-3611

Renee Plumb
Sergeant, Psychological Services Unit
8801 Police Plaza
Upper Marlboro, Maryland 20785
240-354-9803

David Robinson,
Commander, SIRT
8801 Police Plaza
Upper Marlboro, Maryland 20785
301 576-5986; 301 516-5200

Cynthia Ruff
Former Captain, Evidence Unit
Address available upon request
240-695-4849
(By deposition)

Anthony Schartner
Address available upon request
Former Deputy Chief of Police, Bureau of Investigations
301-299-2849; 240-401-6101

Henry Stawinski
Former Chief of Police, Prince George's County
240-538-8314; 240-508-8314

Kellie Sullivan
8801 Police Plaza
Upper Marlboro, Maryland 20785
Civilian Employee, Evidence Unit
240-584-6151

David Vastag
8801 Police Plaza
Upper Marlboro, Maryland 20785
Lieutenant, Evidence Unit

240-997-8117

**\*Defendant Prince George's County reserves the right to call any witness listed on Plaintiff's witness list. \***

**Defendant Prince George's County's Witnesses**

Lt. Richard Tallant

**\*Defendant Lt. Richard Tallant reserves the right to call any witness listed on Plaintiff's witness list or Defendant Prince George's County's Witnesses list. \***

## VIII.   EXPERTS

**Plaintiff's Experts**

Michael L. Hendricks, PhD. (Psychologist)
Washington Psychological Center, P.C.
5225 Wisconsin Avenue, Suite 513
Washington, D.C. 20015

Thomas Borzilleri, PH.D. (Economist)
6701 Democracy Boulevard, Suite 300
Bethesda, Maryland 20817

Mark Lieberman, M.S., C.R.C. (Vocational Expert)
214 Courtland Way
Forrest Hill, Maryland 21050
Washington, D.C. 20015

## IX.   DEPOSITIONS TO OFFERED IN EACH PARTY'S CASE

**Plaintiff**

Video Deposition of Phoenix Langdon:

Plaintiff will play the video deposition of Mr. Langdon.

Deposition of County Designated Agent Robert Black:

Page 7, Line 22 – Page 8, Line 5
Page 9, Lines 1 – 6
Page 10, Lines 6 – 14
Page 11, Lines 11 – 17
Page 12, Lines 4 – 20
Page 13, Lines 6 – 22
Page 16, Line 7 – Page 18, Line 1

Page 21, Line 20 – Page 23, Line 12
Page 46, Line 16 – Page 57, Line 2
Page 59, Line 17 [2] – Page 85, Line 21
Page 86, Line 10 – Page 88, Line 9
Page 92, Line 2 – Page 93, Line 14
Page 94, Line 3 – Page 96, Line 19
Page 98, Lines 6 – 16
Page 102, Line 8 – Page 103, Line 17
Page 105, Lines 5 – 9
Page 106, Line 4 – Page 107, Line 11
Page 110, Line 2 – Page 120, Line 19
Page 144, Line 22 – Page 146, Line 22

Deposition of Richard John Tallant

Page 6, Line 1 – Page 7, Line 3
Page 13, Line 10 – Page 14, Line 22
Page 18, Line 17 – Page 19, Line 6
Page 29, Line 12 – Page 32, Line 12
Page 34, Line 11 – Page 43, Line 8
Page 49, Line 14 – Page 51, Line 5
Page 51, Line 22 – Page 53, Line 19
Page 105, Line 3 – Page 106, Line 6
Page 106, Line 20 – Page 108, Line 11
Page 117, Line 10 – Page 126, Line 22
Page 194, Line 21 – Page 195, Line 22
Page 196, Line 19 – Page 197, Line 4

Deposition of Cynthia Ruff

Page 6, Line 21 – Page 7/15
Page 12, Line 4 – Page 16, Line 1
Page 24, Line 3 – Page 25, Line 18
Page 28, Line 22 – Page 29, Line 22
Page 30, Line 9 – Page 31, Line 17
Page 32, Line 9 – Page 34, Line 20
Page 40, Line 5 – Page 40, Line 10
Page 59, Line 12 – Page 60, Line 13

**Defendant Prince George's County's Counter-Designations**

Deposition of County Designated Agent Robert Black

Page 98, Lines 2 – 16

**Defendant Prince George's County's Designations**

32

Deposition of Captain Cynthia Ruff

>Page 5, Line 9 – Page 6, Line 17
>Page 9, Line 7 – Page 9, Line 16
>Page 10, Line 18 – Page 11, Line 3
>Page 11, Line 17 – Page 12, Line 3
>Page 22, Line 20 – Page 24, Line 2
>Page 25, Line 19 – Page 26, Line 6
>Page 30, Line 1 – Page 30, Line 8
>Page 60, Line 22 – Page 61, Line 18

## X.   PENDING MOTIONS AND OTHER RELIEF

**Plaintiff's Motions**

Plaintiff intends to file a motion to amend the complaint with respect to the *Monell* claim to conform the pleading to the discovery and evidence.  In addition, Plaintiff will also file a motion in limine to bar argument or mentioning that the defendant Richard Tallent's motion for new trial was granted. An order granting Tallant a new trial was granted on March 6, 2023, but it was vacated on April 7, 2023.  State v. Richard John Tallant, Circuit Court for Prince George's County, Case No. CT190907. The motion will also request that any evidence of the trial judge's findings, allegations made by Defendant or his allegations against the prosecutor in that case shall not be mentioned in this lawsuit.

**Defendant Prince George's County's Motions**

1.    On November 22, 2023, the County filed a Motion in Limine or, in the Alternative, to Bifurcate related to Count II, Plaintiff's *Monell* claim.

/s/ Terrell N. Roberts, III
_____
Terrell N. Roberts, III, Esq. (Fed. Bar No. 01091)
*Attorney for Plaintiff*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(202) 217-3904 Fax
troberts@robertsandwood.com

/s/ Christopher A. Griffiths
Christopher A. Griffiths, Esq. (Fed. Bar No. 11770)
Roberts and Wood
*Attorney for Plaintiff*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
cgriffiths@robertsandwood.com


/s/ Kevin Karpinski
Kevin Karpinski, Esq. (Fed. Bar No. 11849)
Karpinski, Cornbrooks & Karp, P.A.
*Attorney for Prince George's County, Maryland*
120 East Baltimore Street, Suite 1850
Baltimore, Maryland 21202-1617
(410) 727-5000
(410) 727-0861 Fax
kevin@bkcklaw.com


/s/ John C. Karpinski
John C. Karpinski Esq., (Fed. Bar No.30706)
Karpinski, Cornbrooks & Karp, P.A.
*Attorney for Prince George's County, Maryland*
120 East Baltimore Street, Suite 1850
Baltimore, Maryland 21202-1617
(410) 727-5000
(410) 727-0861 Fax
Jkarpinski@bkcklaw.com


/c/ Chaz R. Ball
Chaz R. Ball, Esq. (Fed. Bar No. 30044)
Schlachman, Belsky, Weiner & Davey, P.A.
*Attorney for Defendant Richard Tallant*
300 East Lombard Street, Suite 1100
Baltimore, Maryland 21202
(410) 685-2022
(410) 783-4771 Fax
cball@sbwdlaw.com