## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

KARA LYNN McMURRAY,

     Plaintiff,

     v.

RICHARD JOHN TALLANT and
PRINCE GEORGE'S COUNTY,
MARYLAND,

     Defendants.

Civil Action No. 20-0919-TDC

## MEMORANDUM OPINION

Plaintiff Kara Lynn McMurray, a former police officer with the Prince George's County Police Department ("PGCPD"), filed this civil action in which she alleged constitutional and state common law claims against Defendants Prince George's County, Maryland ("the County") and PGCPD Lieutenant Richard Tallant arising from a February 10, 2017 sexual assault by Tallant against McMurray and subsequent retaliation against McMurray within PGCPD after she disclosed the assault. On March 20, 2024, after a 13-day trial in this Court, the jury found in favor of McMurray on all claims. Specifically, the jury found the County liable, pursuant to 42 U.S.C. § 1983, for violations of McMurray's rights under the First Amendment to the United States Constitution based on PGCPD's failure to supervise and discipline officers who retaliated against McMurray and PGCPD's deliberate indifference to the application against McMurray of (1) a PGCPD policy, custom, or practice of "black balling" officers who report officer misconduct, consisting of the shunning, ostracizing, and maligning of such officers, Verdict Form ¶ 6, ECF No. 191; and (2) a PGCPD policy, custom, or practice of subjecting such a reporting officer to the fact of, or reasonable fear of, not receiving backup from other officers while on duty. The jury also found the County liable for violating

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17, by subjecting McMurray to a hostile work environment based on sex that resulted in her constructive discharge and by engaging in unlawful retaliation.

The jury found Tallant liable under § 1983 for violating McMurray's rights under the Fourteenth Amendment to the Constitution to equal protection of the law by subjecting McMurray to sex discrimination and to due process of law by depriving her of liberty during the assault. The jury also found Tallant liable for the common law torts of battery and false imprisonment. Finally, the jury awarded to McMurray $200,000 in non-economic damages from PGCPD and $185,000 in non-economic damages from Tallant.

Beginning on December 10, 2024, the Court (Messitte, J.) conducted a two-day bench trial on the issue of economic damages. Based on the evidence presented at both trials, the Court sets forth below its Findings of Fact and Conclusions of Law on the issue of economic damages. For the reasons stated below, the Court will award back pay and front pay to McMurray in amounts to be determined in accordance with the parameters set forth in this opinion.

## FINDINGS OF FACT

At the bench trial, the parties presented evidence that supplemented the factual record established during the jury trial to address the specific issue of economic damages. McMurray testified on her own behalf and called three additional witnesses: former PGCPD Lieutenant Richard Robert Hinds; PGCPD Senior Corporal Alan Smith; and Dr. Thomas Borzilleri, an economic consultant who testified as an expert witness on economic damages. Defendants called one witness, PGCPD Deputy Chief Curtis Lightner.

The evidence centered on several key factual questions specifically relevant to the issue of whether and in what amount back pay and front pay should be awarded, including (1) whether in

the absence of Defendants' violations and the constructive discharge, McMurray would have continued to work as a police officer at PGCPD until she was eligible for retirement; (2) whether and when she would have been promoted during that time period; (3) whether, following the constructive discharge, McMurray could have been reasonably expected to seek and obtain employment as a police officer at a different police department in the region; and (4) whether she made reasonable efforts to seek and secure other employment so as to mitigate damages. Based on the evidence relevant to these issues that was presented at both the jury trial on liability and the bench trial on economic damages, the Court makes the following factual findings relating to these key issues.

## I.     The Assault and Its Aftermath

McMurray served as a PGCPD police officer from June 2014 to December 2021. On February 10, 2017, after an evening shift ending at approximately 12:30 a.m., McMurray, who was then at the rank of police officer first class, went to the Fraternal Order of Police Prince George's County Lodge 89 ("FOP Lodge") to socialize with fellow officers. After the FOP Lodge closed at 2:00 a.m., McMurray continued to socialize in the parking lot with other officers, including Tallant, who was McMurray's supervisor. When there were only four officers remaining, McMurray went into the woods to relieve herself and was sexually assaulted by Tallant. Two other officers, Officers Justin Burbank and Walter King had gone to look for McMurray and witnessed the aftermath of the assault, including seeing Tallant on the ground and McMurray appearing upset and running back to her car with her pants zipper broken open. Tallant got up, walked to his car, and drove away.

The first or second day that McMurray was back at work following the assault, Tallant cornered McMurray in a short hallway at the police station and asked if she wanted him to transfer

3

from her unit. McMurray told him to leave her alone and left. On several occasions over the next two months, Tallant entered the room in which McMurray worked and stated in a joking manner in front of her and others that officers had gotten him "blacked out drunk" on the night of the assault. Jury Trial Tr. Vol. 2 at 111, ECF No. 245. McMurray was upset that he was treating the assault as a joke and was "embarrassed and intimidated" by these statements. *Id.* at 112. McMurray did not initially report Tallant's assault because she knew that Tallant had "family and friends" in PGCPD and "knew that people would be taking his side." *Id.* at 110. A few months later, however, McMurray told PGCPD Sergeant Richard Jackson, whom she was dating, about the assault. Jackson was upset by the news but confirmed McMurray's fear that if she reported the incident, it would be covered up because Tallant had many friends in PCGPD. McMurray therefore did not report the assault and told Jackson not to do so. In the fall of 2017, McMurray transferred from PGCPD District III, Squad 44, for which Tallant was the lieutenant, to Squad 23, led by Sergeant Jennifer Ivy.

Then in April 2019, over two years after the assault, Jackson told a fellow officer about the assault. That officer reported the incident to the PGCPD Internal Affairs Division ("IAD"). On April 24, 2019, IAD ordered McMurray to come in for an interview without disclosing the subject to be discussed. After IAD Detective Ja'Net Pettus interviewed McMurray at length about the assault, she told McMurray that Tallant's brother-in-law, Joe Ghattas, was a captain in IAD but noted that IAD would not share the details of the interview with him. IAD, however, assigned the investigation to Sergeant Ricardo Jacob, an officer who was new to IAD and had never conducted an IAD investigation before, and who had worked with Tallant for many years. Captain David Robinson, who later transferred into IAD and oversaw Jacob's work, became concerned that Jacob

4

lacked experience in sexual assault investigations generally and did not have a good understanding of the investigation specifically.

After the IAD investigation was initiated, information about the investigation was leaked within PGCPD, which resulted in rumors, verbal attacks, and ridicule of McMurray by fellow officers. Among the false rumors were that McMurray had made unsuccessful sexual advances toward Tallant to advance her career and was now making false allegations, and that she was in a love triangle with Tallant and Jackson. According to Burbank, McMurray was called a "slut," a "giant ho," a "home-wrecker," and other derogatory terms relating to women, and officers were claiming that "she slept with the whole department." Jury Trial Tr. Vol. 3 at 430, ECF No. 246. Corporal Smith, who had served with McMurray on Squad 44, told her about these statements because based on his 32 years as a police officer, he considered it a safety issue in that fellow officers might not back her up when she needed assistance in the field. As he testified, "this is a problem that's pervasive in all police agencies . . . where that one outside guy, because he stands up and maybe testifies against another officer or doesn't follow the code can be ostracized in this way." Jury Trial Tr. Vol. 4 at 727, ECF No. 247. According to PGCPD Detective Robert Shires, who had been trained by McMurray, officers on her squad, in fact, would not provide backup to her when she needed it, and those who did provide backup then would not receive backup themselves.

In June 2019, the investigation was transferred to the Prince George's County State's Attorney's Office ("SAO"). The negative treatment of McMurray then included actions by officers from other police departments. For example, in July 2019, Jessica Matthews, an officer with the Hyattsville Police Department whose husband was a PGCPD officer who had served on

5

Squad 44, sent McMurray multiple private Facebook messages calling her a "home-wrecker." Jury Trial Tr. Vol. 2 at 145.

On September 3, 2019, Tallant was indicted in the Circuit Court for Prince George's County, Maryland on the charge of a second-degree sex offense against McMurray ("the Indictment"). Although Ivy, McMurray's supervisor on Squad 23, had been supportive of McMurray during the IAD and SAO investigations, she was transferred out of that squad without explanation in October 2019, shortly after the Indictment. When news of the Indictment spread, PGCPD officers, including on McMurray's own squad, continued to disparage McMurray and spread false rumors about her, such as by calling her a "home wrecking slut" and a "whore," and by claiming that she had "hooked up regularly" with Tallant and was making a false claim to advance her career and that "she'd sleep with anybody." Jury Trial Tr. Vol. 3 at 434, 436. Some officers refused to provide backup to her during service calls. Because other officers would not provide backup to her, McMurray tried to ensure that junior officers she had trained who were willing to provide backup were on calls with her.

After Ivy's reassignment, and because of the risk of not having backup from other officers, McMurray requested a transfer to the K-9 Unit, the Homeland Security Vice Unit, or the Marine Unit. She was informed, however, that she would not be placed in any of those units because Tallant had friends in each of them. When PGCPD instead suggested the Evidence Unit, McMurray stated that she was not interested in that unit.

On December 4, 2019, McMurray received another Facebook message calling her a "home-wrecker" from the same Hyattsville police officer, Matthews, who had sent her a message in July 2019. Jury Trial Tr. Vol. 2 at 145. McMurray reported the message to Captain Robinson of the IAD, who said that he would notify the Hyattsville Police Department of the incident.

6

McMurray later filed a formal complaint with that department, but there was no response until "much later" when the Hyattsville Police Department got a new police chief who sent McMurray a letter that confirmed that Matthews had sent the message but stated that it was too late to punish that officer because the statute of limitations had run. *Id.* at 147.

Tallant's state criminal trial began on December 10, 2019. As described by the state prosecutor, the defense side of the courtroom gallery was "heavily populated" with police officers supporting Tallant. Jury Trial Tr. Vol. 4 at 532. High-ranking PGCPD officers such as Major Sunny Mrotek and Major James Keleti attended to show support for Tallant, and two, Major Misty Mints and Major Lakina Webster, testified as character witnesses for Tallant. Jacob, the IAD detective who had investigated the assault, even testified as a character witness for Tallant.

On December 18, 2019, the night before the verdict, Robinson informed McMurray that PGCPD was immediately transferring her to the Evidence Unit. On December 19, 2019, the jury returned a verdict of guilty against Tallant on the charge of second-degree sexual offense. The transfer took McMurray away from the traditional law enforcement duties that she preferred and resulted in a loss of income because she logged fewer hours than as a patrol officer. Once McMurray arrived in the Evidence Unit, she applied for a transfer to the K-9 Unit but was denied. As an evidence technician, McMurray continued to face hostility, as detectives shunned her at crime scenes by stopping conversations with other evidence technicians when she approached and walking away.

On February 10, 2020, McMurray filed a complaint of sex discrimination with the United States Equal Opportunity Employment Commission ("EEOC"). The same day, she filed the present civil action in the Circuit Court for Prince George's County, which was then removed to this Court.

7

In March 2020, PGCPD Lieutenant Patrick Hampson contacted members of McMurray's former squad, Squad 44, and asked them questions about McMurray as part of an unauthorized investigation and in doing so verbally spread false rumors about McMurray, including about an alleged romantic relationship between McMurray and King, who had testified at Tallant's trial. According to McMurray, this incident was "another thing that just showed me that I had no future" at PGCPD. Jury Trial Tr. Vol. 2 at 180.

In October 2021, McMurray learned from an officer of the Charles County Sheriff's Office that McMurray's co-worker in the Evidence Unit, Kelly Sullivan, had called her "an ungrateful bitch" and stated that members of the Narcotics Enforcement Division, where Tallant had worked, were "right" that she was a "snitch" who "slept with a bunch of officers." *Id.* at 192. Sullivan had also stated that Lieutenant David Vastag, a supervisor in the Evidence Unit, had held a meeting at which he called McMurray "an ungrateful bitch" and said that McMurray would report people to IAD if they spoke to her. *Id.* at 190. McMurray then requested a meeting with Vastag and former Lieutenant Hinds, her supervisor who was working in a civilian capacity, and reported the statements. In response, Vastag, asked, "Well, what do you want me to do about it?" *Id.* at 194. Hinds stated that there needed to be an investigation. However, in a follow-up meeting on November 1, 2021 with Captain Cynthia Ruff and Vastag, Ruff told McMurray that the matter would not be referred to IAD because Sullivan had a "First Amendment right to not like" McMurray. *Id.* at 195. Where PGCPD took no corrective action, McMurray resigned from PGCPD, effective December 4, 2021. At the jury trial, in finding PGCPD liable under Title VII, the jury found that this action constituted a constructive discharge resulting from a hostile work environment.

8

## II.   Work History

McMurray entered the PGCPD police academy as a 21-year-old on October 21, 2013. In June 2014, she graduated from the academy and began her work as a police officer. In October 2016, three years after entering the academy, she became eligible to take the examination for promotion to the next rank, passed it on her first try, and was promoted to police officer first class. In April 2019, when McMurray was first eligible to take the examination for promotion to corporal, she passed the exam and was promoted in May 2019. She did so even though she took the exam approximately a week after she was subjected to the IAD's unexpected interview in which she was questioned about the assault, which affected her "mental well-being." Bench Trial Tr. Vol. 1 at 32, ECF No. 235. By the time PGCPD constructively discharged McMurray on December 4, 2021, McMurray had served at PGCPD for over eight years.

Throughout her service as a PGCPD officer, McMurray earned strong annual performance reviews. In her first annual appraisal, conducted only four months after she graduated from the police academy, she received satisfactory ratings in all five categories. The next year, for the year ending in October 2015, her appraisal was nearly identical except that she improved in the "communications" category to the level of "exceeds satisfactory." Pl.'s Bench Trial Ex. 4. By her third year, October 2015 to October 2016, McMurray received the highest possible rating of "Outstanding" in two of the four categories, and the second highest possible rating of "Exceeds Satisfactory" in the other two categories. Pl.'s Bench Trial Ex. 5. During her fourth year and her first as a police officer first class, October 2016 through October 2017, McMurray received "Outstanding" ratings in all six categories even though she suffered the assault by Tallant in February 2017. Pl.'s Bench Trial Ex. 6. For every year during the rest of her tenure at PGCPD, including the years ending in October 2018, October 2019, October 2020, and October 2021, she

9

maintained an Outstanding rating in all categories. Notably, McMurray maintained the highest ratings even after the details of her report of the assault emerged in April 2019 and after she was involuntary transferred away from her path of traditional police work into the Evidence Unit in December 2020.

## III.    Length of Service

The evidence demonstrates that in the absence of the constructive discharge, McMurray would have remained as a PGCPD officer until she was eligible for retirement in October 2033. McMurray specifically testified that she "loved being a police officer" and "loved the career," and that she had intended to stay with PGCPD for the full 20-year period required before retirement. Bench Trial Tr. Vol. 1 at 21.

McMurray's career path from before she joined PGCPD up to the time of her constructive discharge corroborates her testimony. In high school, McMurray took multiple courses on criminal justice, and outside of school, she participated in the "Explorers Program" at the Calvert County Sheriff's Office. *Id.* at 22. In the Explorers Program, McMurray wore a uniform, attended presentations by law enforcement officers about their work, engaged in physical fitness training, and conducted community service. By the end of her time in the program, she had achieved its highest rank. Then, after high school, McMurray earned an associate's degree in criminal justice from the College of Southern Maryland and graduated with honors. She entered the PGCPD police academy at age 21. As discussed above, McMurray excelled as a police officer, including in that she received the highest ratings in every category of her annual performance evaluations each year from 2016 to 2021. *See supra* Findings of Fact Part II.

Furthermore, as to the typical length of time that PGCPD officers remain in their positions, according to PGCPD statistics, approximately 78 percent of officers who serve more than eight

years reach the 20-year mark, when they can earn a full pension. For officers like McMurray who reach at least the rank of corporal, over 86 percent stay with PGCPD until retirement, retirement based on a disability, or death. Indeed, McMurray was specifically incentivized to remain at PGCPD because of the pension and benefits that would come upon retirement. In her testimony, McMurray noted that PGCPD "had an amazing retirement and pension and health benefits for my life and for my family's life" and stated that she chose PGCPD specifically because it "had the best pension," including health benefits after 20 years of service. Bench Trial Tr. Vol. 1 at 21.

Based on these facts, the Court finds that in the absence of the constructive discharge, McMurray would have remained as a PGCPD police officer until she was eligible for retirement.

## IV.    Promotions

On the issue of whether and when McMurray would have been promoted before retirement, PGCPD had a defined promotion process for positions above corporal, including sergeant, lieutenant, and captain. Where the process for the first two promotions to the positions of police officer first class and corporal were based solely on receiving a passing score of 70 on a written examination, the higher-level promotions were based on a promotion process, conducted every two years, that consisted of two components. Specifically, such a promotion required both a passing score on a written examination and a passing score on a skills-based evaluation that included two parts. First, the skills-based evaluation required candidates to perform approximately 10 administrative duties within 2 hours in order to assess their ability to prioritize and solve problems. Second, it had an operational component in which candidates were presented with three different scenarios requiring them to address "a series of critical incidents" that occur "all at the same time." Bench Trial Tr. Vol. 2 at 154, ECF No. 237. This part required candidates to provide their answers by "speaking to a camera" in order to create a video that was later graded by higher-

ranked police officers from outside of PGCPD. *Id.* The candidates were then placed on a promotion list in the order of their overall performance, which was based on a combination of the scores from the written examination and the skills-based evaluation. The candidates were promoted in the order they were placed on the promotion list to fill available vacancies at the higher rank at issue, with candidates promoted only when a vacancy arose during the approximately two-year period running until 60 days before the next promotion cycle began in April of each even-numbered year. According to Deputy Chief Lightner, during a promotion cycle for sergeant, approximately 250 officers take the written examination, and about 50 to 60, or approximately 20 percent, are actually promoted during that cycle.

Based on the evidence presented, the Court finds that McMurray would have been promoted to both sergeant and lieutenant during her remaining time at PGCPD. First, she had already demonstrated that she could successfully pass the written PGCPD promotion examinations when on her first attempts she passed the examination for the rank of police officer first class in October 2016 with a score of 78 and the examination for corporal in April 2019 with a score of 80.

As for the skills-based evaluations, McMurray's work history illustrates that she had the ability to succeed on them. As discussed above, McMurray received outstanding ratings in all categories on her annual performance appraisals for all years from 2017 to 2021. *See supra* Findings of Fact Part II. More importantly, her supervisors' written evaluations of her work illustrate that they saw her as an officer who could be promoted to the leadership levels of PGCPD, and that she would have been successful on both the operational and administrative parts of those evaluations. In October 2016, McMurray's supervisor provided extensive, positive written reviews of her operational skills, including that McMurray "responds promptly to calls for

12

service," that she had "developed a great working knowledge of the geographic area in which she is assigned to patrol," that she "conducts thorough preliminary investigations" and "is very professional," and that she had "developed into a well-rounded police officer" and had "become a very valuable asset" to PGCPD. Pl.'s Bench Trial Ex. 5. Likewise, in October 2017, her supervisor described her as "a dedicated officer who aggressively patrols," who was "always prepared for court," with "paperwork . . . always in order," and an officer who could be counted on "to exemplify" an "'esprit-de-corps' philosophy" and who "serves as an excellent example to subordinate officers." Pl.'s Bench Trial Ex. 6. In October 2018, McMurray's supervisor reported that McMurray was "encouraged to continue her outstanding work ethic and dedication to the service of the community" and was "encouraged to expand her career path and pursue additional investigative experience." Pl.'s Bench Trial Ex. 7. In October 2019, McMurray's first year as a corporal, her supervisor stated that she had taken on "Senior Corporal responsibilities" and was "a leader" on her squad who was "often mentoring the younger Officers." Pl.'s Bench Trial Ex. 8. Her supervisor specifically encouraged her "to continue to study and prepare for future promotional exams." *Id.*

In the October 2020 performance appraisal, McMurray's supervisor reported that she was "self-motivated and complete[d] her assignments with little supervision" and was "an example for others to follow." Pl.'s Bench Trial Ex. 9. Finally, in October 2021, her supervisor in the Evidence Unit reported that she "professionally processes crime scenes," was "well-prepared for court" when she had to testify relating to the collection and preservation of evidence, and "performed all work assigned to her in an exceptional and timely fashion." Pl.'s Bench Trial Ex. 10.

Furthermore, during the bench trial, Corporal Smith, McMurray's former supervisor, testified that McMurray was "[h]ighly motivated, intelligent," and "handled herself well on the

13

street," Bench Trial Tr. Vol. 1 at 121, and that she was one of those officers who "wanted to promote and go up the ladder through testing" and was "smart enough" to do so, *id.* at 126. He specifically testified that McMurray displayed the qualities typically seen in officers of higher ranks, including "[f]airness, equitable handling of people, care for the community, care for the personnel, knowledge of the job itself," and "[k]eeping up with the times" and "changing policing attitudes." *Id.* at 125. As for her knowledge and abilities relating to operations, Smith noted that McMurray had been selected to serve as a field training officer to train junior officers, a role which, according to Smith, typically goes to officers who "show certain abilities" such as "leadership," "knowing how to handle themselves, knowing the general orders, knowing the policies and procedures," and the "ability to teach." *Id.* at 123. Not only did McMurray train other officers on operational procedures, as Burbank testified, she was a "go-to person [for] questions on how to handle things [officers] didn't encounter during field training." Jury Trial Tr. Vol. 3 at 400.

As for her ability to succeed on the administrative part of the skills-based evaluation, Smith testified that in part because he was aware that McMurray had bookkeeping experience, he assigned her to assist him with various administrative functions, including those relating to the payroll schedule and recording the results of squad inspections. Relatedly, Hinds, McMurray's supervisor in the Evidence Unit, testified that McMurray was "a model employee," "very efficient" in her crime scene work, and "one of my best crime scene [investigators]," and that her "reports were always excellent." Bench Trial Tr. Vol. 1 at 118–19.

Finally, the evidence established that McMurray was self-motivated to prepare effectively for the promotion processes. She testified that in every aspect of her life, "I've always strived to go as high up as I can" and noted that she had been rapidly promoted in both her roles before and at PGCPD, and that she was rapidly promoted after she began working in security roles at

14

Constellation Energy Corporation ("Constellation") following her constructive discharge. *Id.* at 37. While at PGCPD, McMurray was already aware of classes that senior officers provided for a fee to prepare candidates for the skills-based evaluations by presenting them with the kind of real-world scenarios that would appear in the evaluations, and she had planned to take such classes to prepare herself for the promotion processes.

Based on this evidence, which was largely unrefuted, the Court finds that McMurray was likely to have been successful on both the written examinations and skills-based evaluations required for promotion to sergeant and lieutenant because she had shown the ability to pass the written examinations, her work performance placed her among the top group of officers who would seek promotion to sergeant and above, she was motivated to do what was required to succeed in the promotion processes, and she had the operational, administrative, and leadership skills to do so. Accordingly, the Court finds that, even with the highly competitive process for promotion to sergeant and above, McMurray would have been promoted to both sergeant and lieutenant during her PGCPD career.

The Court, however, does not find that McMurray has shown that she was so clearly at the top of the group of police officers seeking promotions that she would necessarily have been promoted on her first attempts. Significantly, according to Deputy Chief Lightner, her passing scores on the written police officer first class and corporal examinations were below the 50th percentile, and lower than the scores that would usually be required in order to be promoted to sergeant. Based on the vacancies arising during the promotion cycles occurring every two years from 2018 to 2022, of the candidates who passed the written examination for sergeant, only the top 17 to 30 percent, depending on the year, were actually promoted. During the same time period, of the candidates who passed the lieutenant examination, only the top 31 to 35 percent were

15

actually promoted. Thus, although the evidence referenced above shows that McMurray had the ability and motivation to score sufficiently high on the written examinations to achieve promotion, particularly where she achieved a passing score on the corporal examination even while taking it only a week after the IAD interview in which she revealed the assault, she has not shown that she necessarily would have raised her scores on her first attempts to the point that her overall scores would have been sufficient to be promoted during those first promotion cycles. The Court therefore finds that McMurray would have been promoted to sergeant and lieutenant no later than her second attempt, which would amount to approximately four years in the prior position. Where McMurray would have been first eligible to enter the promotion process for sergeant in April 2022, her second attempt would have been in April 2024. In turn, the Court finds that McMurray has demonstrated that she would have been promoted to lieutenant after her second attempt, which would be after the April 2028 promotion process. Because promotions would not begin until approximately six months after the process began, the Court finds that the promotions to sergeant and lieutenant would have occurred in or about October 2024 and October 2028, respectively.

Where McMurray has not shown that she would always have been promoted at the earliest possible time, the Court does not conclude that she has established that she would have been promoted to positions above lieutenant during her remaining time before retirement. To the extent that McMurray would have been promoted to lieutenant in October 2028, a promotion to captain on her second attempt would have occurred no earlier than October 2032, but depending on her rank on the promotion list and the available vacancies, the promotion might not occur until after October 2033, particularly where at a given time there were only approximately 30 captains at PGCPD out of 1,428 officers. Moreover, where, as stated by Deputy Chief Lightner, a PGCPD officer's retirement benefit is based on the officer's two highest annual salary amounts, a 2032

16

promotion would not have occurred in time for McMurray to earn the full retirement amount based on a captain's salary before October 2033. Where the average years of service to be promoted to captain was 21 years, and given the number of factors that could alter the course of McMurray's police career before that point, the Court does not find that the evidence presented has established that McMurray would have reached that level, or the next level of major, before retirement.

## V.    Future Employment as a Police Officer

The Court also finds, based on the evidence discussed above, that following her constructive discharge and going forward, McMurray could not reasonably be expected to pursue a career as a police officer in the area reasonably proximate to McMurray's home area of Calvert County, Maryland. First, as found by the jury at trial, PGCPD had, and was deliberately indifferent to, policies, customs, or practices to which McMurray was subjected consisting of (1) "black balling" officers who report misconduct by another officer, including through "shunning, ostracizing" and engaging in "hostile comments" or "slander" against the reporting officer, Verdict Form ¶ 6; and (2) subjecting such officers to not receiving backup from fellow officers while on duty. The evidence at the jury trial established that as a result of reporting the assault, McMurray was repeatedly called derogatory terms such as "slut," "giant ho," "whore," and "home-wrecker," and she was subjected to rumors such as that she had had sought a sexual relationship with Tallant in order to advance her career and was retaliating by falsely accusing him of the assault, and that she had "slept with the whole department." Jury Trial Tr. Vol. 3 at 430, 434. As Shires testified, there were police officers on her squad who would not provide backup to McMurray or to other officers who did provide backup to her, which created a safety issue for her. Not only did PGCPD command staff do "nothing" to protect McMurray from such treatment, Bench Trial Tr. Vol. 1 at 19, several high-ranking PGCPD officers joined many other officers in attending Tallant's criminal

17

trial in support of him. Incredibly, the officer who conducted the IAD investigation of the assault testified as a character witness for Tallant. Based on this record, the County does not argue that reinstatement at PGCPD was a viable option for McMurray.

Second and more importantly, the evidence demonstrates that McMurray reasonably fears that she would be subjected to similar treatment if she sought and obtained employment at a different police department in the region. As Smith testified at the jury trial, the kind of ostracism and mistreatment of police officers who report misconduct by other officers, including failing to provide backup when needed, "is a problem that's a pervasive in all police agencies." Jury Trial Tr. Vol. 4 at 727. Here, there is also specific evidence that officers within other police departments in the region, some of whom had prior connections to Tallant, were aware of McMurray's report of the assault, and some even participated in the hostile treatment of McMurray or of people associated with her. For example, Jessica Matthews, a police officer at the Hyattsville Police Department located within Prince George's County who is married to a PGCPD officer, posted derogatory comments about McMurray on Facebook, including that she was a "home-wrecker." Jury Trial Tr. Vol. 2 at 145.

After the verdict in Tallant's criminal trial, Lieutenant Elliott of the Charles County Sheriff's Office ("CCSO") located in the county adjacent to Prince George's County, who was the president of the Fraternal Order of Police, filed a complaint against McMurray's fiancé, who also works at CCSO, because he attended the trial to support McMurray. In addition, several retired PGCPD officers had gone on to work at CCSO, including Sammy Hooper, who worked with Tallant and was a co-defendant with him in several civil cases. More recently, in 2024, a CCSO officer who is a friend of Tallant's son falsely told a classroom full of officers at a training class that McMurray had lied about Tallant and had slept with multiple officers.

18

Finally, as McMurray testified, because Tallant worked in units that engaged with counterparts in surrounding counties, including as a SWAT officer and narcotics officer, he has "connections" with "all the officers in those units in the surrounding area." Bench Trial Tr. Vol. 1 at 54. For example, Officer Mark Howard of the St. Mary's County Sheriff's Office, located two counties away from Prince George's County, also attended the criminal trial in support of Tallant. Based on all of this evidence, the Court agrees with McMurray's conclusion that "no department in this area is safe" for her. *Id.*

In the face of this evidence, the County asserts that there are other police departments not specifically referenced in the evidence presented by McMurray, including federal law enforcement agencies in Washington, D.C., at which McMurray could have sought a police officer position, and that there is currently a national shortage of law enforcement officers. Beyond failing to address the significant distance from McMurray's home in Calvert County, Maryland to Washington, D.C. or the lack of evidence of whether McMurray would have met the criteria necessary to be hired by a federal law enforcement agency, the County provides no basis to refute the evidence that the custom and practice of blackballing officers who report misconduct by other officers is widespread, that Tallant has substantial connections with police officers at other departments in the region, and that the "rumors and widespread disparaging remarks" about McMurray have already spread across police departments in the region. *Id.* Based on the significant evidence on these points, the Court finds that it is not necessary for McMurray to provide specific evidence relating to every police department to show that it is not reasonable to expect her to work at a police department in this area. The national shortage of police officers is therefore irrelevant because McMurray's inability to work at a police department is not based on any lack of available

positions. Accordingly, the Court finds that the evidence establishes that McMurray cannot reasonably be expected to pursue a career as a police officer in her home region.

## VI.    Efforts to Mitigate Damages

The Court also finds that McMurray made substantial efforts to mitigate her loss of income through the various positions she has taken since her constructive discharge on December 4, 2021. McMurray first found remote work as an invoice administrator for a New York elevator company, a position which utilized her strong administrative skills that she had previously demonstrated at PGCPD. As McMurray worked for that company during the first half of 2022, she continued to apply for other jobs but did not receive interviews. She therefore took a 60-hour course and an examination in order to obtain a real estate license, through which she then sold two properties. Then, after having submitted multiple applications for a security position with Constellation at its Calvert Cliffs nuclear power plant, McMurray was hired by Constellation in May 2023. She continues to work there. The Court therefore finds that McMurray made substantial, reasonable efforts to seek alternative sources of income to mitigate damages following her constructive discharge from PGCPD.

## CONCLUSIONS OF LAW

At trial, McMurray prevailed on her Title VII claims against PGCPD. Title VII is a broad remedial statute designed to make victims of discrimination whole. *See* 42 U.S.C. § 2000e-2; *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763–64 (1976). To effectuate Title VII's remedial intent, district courts have broad equitable discretion to award back pay, front pay, and interest. *See Franks*, 424 U.S. at 763–64; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416–17 (1975); *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 389 (D. Md. 1997). Based on the evidence presented at trial, the Court will award back pay and front pay pursuant to the analysis below.

## I.    Back Pay

Generally, upon a finding of a violation of Title VII, a court may award back pay. *See* 42 U.S.C. § 2000e-5(g)(1); *Albemarle Paper*, 422 U.S. at 420–21. As relevant here, a back pay award should cover the time period from the date of discharge to the date of the judgment. *See Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 269 (4th Cir. 1976) (stating that back pay should be allowed for the period from when "the employee was unlawfully denied a position until the date of judgment"); *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) ("Absent compelling circumstances . . . the court should compute the backpay award from the date of the discriminatory act until the date of final judgment"); *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1472–73 (11th Cir. 1985). Back pay should "'make the victims of unlawful discrimination whole' by restoring them, 'so far as possible . . . to a position where they would have been were it not for the unlawful discrimination.'" *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982) (quoting *Albemarle Paper*, 422 U.S. at 421). Back pay, however, should not provide a "windfall." *Cline v. Roadway Exp., Inc.*, 689 F.2d 481, 490 (4th Cir. 1982). Thus, a back-pay award is subject to a duty to mitigate damages and therefore must be reduced by the amount of any "earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1); *see Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). Back pay is calculated by totaling the employee's lost wages and benefits, less amounts earned through other employment or wages that could have been earned through "reasonable diligence." *See EEOC v. Key Mgmt. Partners, Inc.*, No. 21-cv-02496-PX, 2024 WL 4569875, at *2 (D. Md. Oct. 24, 2024) (quoting 42 U.S.C. § 2000e-5(g)(1)). The defendant has the burden to establish that a plaintiff "did not exert reasonable efforts to mitigate . . . damages." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995).

21

Having prevailed on her Title VII claims, McMurray is entitled to back pay from the date of her termination, consisting of the constructive discharge on December 4, 2021, to the date of judgment. In opposing an award of back pay, the County initially argues that no award is warranted because McMurray failed to mitigate damages by seeking a substantially equivalent position with another police department and, for purposes of front pay, by disavowing any intent to do so in the future. As discussed above, however, the Court has found that McMurray could not reasonably be expected to seek another position as a police officer and made substantial efforts to mitigate damages when she sought and obtained a position as an invoice administrator, obtained her real estate license and began to sell houses, and then secured her current position with Constellation. *See supra* Findings of Fact Parts V, VI. She therefore made the required reasonable efforts to mitigate damages.

Otherwise, the County argues only that McMurray should not be granted back pay based on the assumption that she would have been promoted to sergeant in 2022. For the reasons discussed above, the Court has found that McMurray has not sufficiently established that she would have been promoted at that time, but it has found that she would have been promoted to sergeant during the April 2024 promotion cycle, with her formal promotion to occur in or about October 2024. *See supra* Findings of Fact Part IV. Accordingly, the Court will award back pay as calculated based on her salary as a corporal through October 2024 and as a sergeant from October 2024 to the date of the final judgment.

Plaintiffs' expert witness, Dr. Thomas Borzilleri, calculated two different back-pay award amounts, one based on the assumption that McMurray would have been promoted to sergeant in October 2022 and one based on the assumption that she would have remained as a corporal throughout the back pay period. Dr. Borzilleri relied on public pay tables for PGCPD, which show

salary by years of service and rank. Dr. Borzilleri also reduced the award by the income and benefits she actually earned at Constellation. Other than as discussed above, PGCPD does not object to Dr. Borzilleri's methodology or calculations or offer its own alternative calculations. The Court will therefore accept Dr. Borzilleri's methodology but will direct McMurray to have Dr. Borzilleri recalculate the back pay amount based on (1) the finding that McMurray would have been promoted to sergeant on October 31, 2024; and (2) the assumption that the date of the final judgment, and therefore the date that the back pay period will end, will be 14 days after the date that the revised calculations are submitted to the Court.

## II.    Front Pay

McMurray also seeks front pay for the over eight-year period from the date of the final judgment to her projected PGCPD retirement date of October 21, 2033. Ordinarily, to provide a remedy for future losses arising from a wrongful discharge, courts must analyze "all the circumstances existing at the time of trial for the purpose of tailoring a blend of remedies that is most likely to make the plaintiff whole." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991). Generally, the preferred remedy is reinstatement. *See id.* Such a remedy, however, may not be appropriate when the employer has demonstrated "such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible." *Id.* (quoting *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985)). Here, the County does not claim that reinstatement is appropriate in this case. In any event, the Court credits McMurray's testimony that she would not be able to return to PGCPD because "it was a very unsafe place" where "command staff did nothing . . . to support me and protect me, which allowed rumors to spread and my safety to be a real concern," and that "going back to that, nothing would change." Bench Trial Tr. Vol. 1 at 19–20. The Court further finds that McMurray's testimony is

23

supported by the facts, referenced above, demonstrating that PGPCD had a custom and practice of blackballing officers who reported misconduct by other officers, including by failing to provide backup while in the field, and that in this instance, McMurray would continue to face retaliation and hostile and abusive treatment from fellow officers that renders reinstatement not viable. *See supra* Findings of Fact Parts I, V.

When reinstatement is not an available remedy, a court may order front pay as an equitable remedy "to avoid the potential of future loss." *Duke*, 928 F.2d at 1423. It may be used to "bridge a time when the court concludes the plaintiff is reasonably likely to obtain other employment," but in some instances, such as when a plaintiff is close to retirement, it "may be the only practical approach." *Id.* at 1424.

Although there is no "bright line test" for awarding front pay, a court may consider a variety of factors, including "the plaintiff's age; the length of plaintiff's employment with the defendant-employer; the likelihood that plaintiff's employment would have continued absent the discrimination; the length of time it would take plaintiff to secure comparable employment using reasonable efforts; plaintiff's work and life expectancy; the typical length of time other employees held the position lost; plaintiff's status as an at-will employee; plaintiff's ability to work, including the ability to work for the defendant-employer; plaintiff's subjective intention to remain in the position; and plaintiff's efforts to mitigate damages." *Hunter v. Town of Mocksville*, 897 F.3d 538, 563 (4th Cir. 2018). Also relevant are a plaintiff's experience and level of education. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009). In assessing whether and in what amount front pay should be awarded, courts must analyze "all the circumstances existing at the time of trial" and draw "reasonable conclusions," *Hunter*, 897 F.3d at 563 (quoting *Hunter v. Town of Mocksville*,

201 F. Supp. 3d 750, 758 (M.D.N.C. 2016)), while avoiding undue speculation that results in a windfall for the plaintiffs, *see Dotson*, 558 F.3d at 300.

McMurray seeks front pay for the over eight years from the date of the final judgment until she would be eligible to retire from PGCPD, as well as the pension that would come with retirement, based on the evidence showing that she would have stayed at PGCPD throughout that period in the absence of the discrimination, that she cannot reasonably be expected to work as a police officer at a different police department in her home region, and that she will reasonably mitigate damages during those years. As for the specific award, she seeks the amount that she would have received if she had been promoted to major by the time she retired but offers different proposed amounts in the event the Court finds that she would have attained a lesser rank by that time. In contrast, the County argues that (1) an award of front pay is unduly speculative in light of McMurray's age and the number of years until retirement; (2) McMurray's assumption that she would have been promoted multiple times and at a rapid rate is unduly speculative; and (3) the proposed amounts are unduly speculative because McMurray has not provided sufficient evidence of her future earning potential.

The Court finds that front pay up to McMurray's retirement eligibility date is appropriate based on a consideration of the relevant factors identified in *Hunter* and *Dotson*, including McMurray's age, education, experience, and length of employment with PGCPD, the likelihood that she would have stayed absent the discrimination, her work and life expectancy, her ability to work, and her subjective intent to remain with PGCPD. *Hunter*, 897 F.3d at 563; *Dotson*, 558 F.3d at 300. Although McMurray was only 29 years old at the time of the constructive discharge, she had already served as a police officer with PGCPD for 8 years and was eligible to retire only 12 years later, after a total of 20 years. As discussed above, and as the Court has found, McMurray

would have stayed at PGCPD through retirement in October 2033. *See supra* Findings of Fact Part III. She testified that she always wanted to be a police officer, she took actions dating back to high school demonstrating that interest, and she studied for and received a degree in criminal justice. She had already developed substantial experience as a police officer and was certainly capable of continuing to work in that position, particularly in light of her stellar performance evaluations and the fact that she had been promoted twice already. She not only expressed an intent to stay until retirement and had specifically chosen PCGPD because of its pension benefits, but she had reached the point at which, statistically, 86 percent of officers stay until retirement.

Although over eight years is a lengthy period of time for a front pay award, there is no outer limit on the length of such an award, which can be based on an "infinite variety of factual circumstances." *Duke*, 928 F.2d at 1424. Courts have awarded front pay for comparable time periods when the circumstances warranted it. *See, e.g.*, *Donlin v. Phillips Lighting N. Am. Corp.*, 581 F.3d 73, 88 (3d Cir. 2009) (affirming a district court's front pay award covering 10 years); *Meacham v. Knolls Atomic Power Lab'y*, 381 F.3d 56, 78–79 (2d Cir. 2004) (affirming awards of 9, 10, 12, and 12.5 years), *vacated on other grounds sub nom.*, *KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d. 1148, 1157 (9th Cir. 1999) (affirming an 11-year front-pay award); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Loc. No. 101*, 3 F.3d 281, 285–86 (8th Cir. 1993) (upholding a 10-year front-pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574–75 (7th Cir. 1995). Notably, in *Pierce*, the court upheld a district court's grant of a 10-year award of front pay to a plaintiff who was 10 years away from retirement based in part on the conclusions that the plaintiff "was as likely as any and probably more likely than most to work to retirement" because "his job was of 'immense importance' to him," and an employee such as the plaintiff "would receive reduced

retirement benefits if he resigned before that time." *Pierce*, 65 F.3d at 574–75 (vacating the award pending a remand for a determination of whether the plaintiff had executed a knowing and voluntary release of claims but directing that it should be reinstated if no such release was executed). Where, as discussed above, McMurray's proposed award of between eight and nine years of front pay is warranted for similar reasons, the Court rejects the County's assertion that an award of this length is unduly speculative.

As for the other objections, although the Court agrees in part with the County that McMurray's assumptions about when she would be promoted are not fully supported by the evidence, the Court finds that, as discussed above, the evidence demonstrates that she would have been promoted to sergeant and lieutenant before her retirement, by the time of her second attempts to be promoted to those positions. *See supra* Findings of Fact Part IV.

Finally, as for the County's assertion that the evidence does not fairly address McMurray's future earning potential, the Court has found that the conduct at issue in this case has effectively precluded McMurray from continuing to work as a police officer in her home region. *See supra* Finding of Fact Part V. In light of that finding, the Court finds that McMurray's present career path as a security officer at Constellation fairly represents her earning potential over the time period of a front pay award. Although McMurray remains relatively young, all of her prior education and experience is related to police work, a field from which she is now effectively blackballed. Her present role in a related field is a reasonable alternative during this time period, because to pivot to another career path would likely require additional education, which would be difficult in part because she now has significant family responsibilities. Indeed, the County has presented no evidence supporting the conclusion that there is some non-police career presently available to her other than the path she is pursuing in the security field. The Court therefore finds

27

that front pay should be awarded in an amount consisting of what she would earn at PGCPD until her retirement date, reduced by the amount that she has earned and is projected to earn at Constellation.

As for the specific amount, although Dr. Borzilleri has calculated a front pay award amount based on the assumption that McMurray would have been promoted as far as lieutenant, and the County does not dispute the methodology or accuracy of the calculations, that calculation is based on the assumption that McMurray's promotions to sergeant and lieutenant would have occurred at the earliest possible time, after two years in the prior positions. The Court will therefore direct McMurray to secure revised calculations by Dr. Borzilleri that calculate front pay in the same manner except based on the projected date of final judgment in this case and based on the assumptions that (1) McMurray would have been promoted to sergeant on October 31, 2024; (2) McMurray would have been promoted to lieutenant on October 31, 2028; and (3) McMurray would not have been further promoted before retirement.

## CONCLUSION

For the foregoing reasons, the Court will award back pay and front pay to McMurray in amounts to be calculated consistent with the findings in this opinion. A separate Order shall issue.

Date:   May 23, 2025

THEODORE D. CHUANG
United States District Judge